# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

KANI ADON BERMUDEZ-BEY and
REGIS KISHON GREEN on behalf
of themselves and all others similarly
situated,

               *Plaintiffs,*

v.

CITY OF GRAHAM, MARY
KRISTINE ("KRISTY") COLE,
individually and her official capacity
as Chief of the Graham Police
Department ("GPD"), ALAMANCE
COUNTY, TERRY S. JOHNSON,
individually and in his official
capacity as Sheriff of Alamance
County, CLIFF PARKER,
individually and in his official
capacity as Chief Deputy of the
Alamance County Sheriff's Office
("ACSO"), BARBARA TOMEY,
individually and in her official
capacity as Corporal of the ACSO,
CHAD MARTIN, individually and in
his official capacity as Lieutenant of
the ACSO, DANIEL NICHOLS,
individually and in his official
capacity as a Deputy of the ACSO,
JAMES MCCLELLAND,
individually and in his official
capacity as a Deputy of the ACSO,
RANDY DENHAM, individually and
in his official capacity as a Captain of
the ACSO, DAVID SYKES,
individually and in his official
capacity as a Captain of the ACSO,
CHIP COBB, individually and in
his official capacity as a Sergeant of

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 1:23cv-00894

**COMPLAINT—CLASS ACTION**

1

the ACSO, PETER TRIOLO, )
individually and in his official )
capacity as a Deputy of the ACSO, )
CHANDLER WEGER, individually )
and in his official capacity as a )
Deputy of the ACSO, JAMES )
MCVEY, individually and in his )
official capacity as a Sergeant of the )
ACSO, TAYLOR HOPKINS, )
individually and his official capacity )
as a Deputy of the ACSO, JOAQUIN )
VELEZ, individually and in his )
official capacity as Patrol Operations )
Lieutenant for the GPD, DUANE )
FLOOD, individually and in his )
official capacity as Support Services )
Captain for the GPD, RODNEY )
KING, individually and in his official )
capacity as a Sergeant for the GPD, )
JUSTIN HOPKINS, individually )
and in his official capacity as an )
Officer for the GPD, NOAH SAKIN, )
individually and in his official )
capacity as an Officer for the GPD, )
SCOTT NEUDECKER, individually )
and in his official capacity as an )
Officer for the GPD, ERIC JORDAN, )
individually and in his official )
capacity as an Officer for the GPD, )
ROBERT PARKS, individually and in )
his official capacity as an Officer for )
the GPD, JOSHUA PAYNE, )
individually and in his official )
capacity as an Officer for the GPD, )
JOHN WAY, individually and in his )
official capacity as an Officer for the )
GPD, KEITH KIRKMAN, )
individually and in his official )
capacity as an Officer for the GPD, )
CHAD BOGGS, individually and in )
his official capacity as an Officer for )
the GPD, CHRISTOPHER DENNY, )

2

| | |
|---|---|
| individually and in his official capacity as an Officer for the GPD, BRANDON LAND, individually and in his official capacity as an Officer for the GPD, CITY OF GRAHAM POLICE OFFICERS JOHN and JANE DOES #1-15, and ALAMANCE COUNTY DEPUTY SHERIFFS JOHN and JANE DOES #16-30. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| *Defendants.* | ) |

Plaintiffs Kani Adon Bermudez-Bey and Regis Kishon Green, on behalf of themselves and other similarly situated individuals, by and through their counsel, file this class action complaint against Defendants Kristy Cole, Terry Johnson, Cliff Parker, Barbara Tomey, Chad Martin, Daniel Nichols, James McClelland, Randy Denham, David Sykes, Chip Cobb, Peter Triolo, Chandler Weger, James McVey, Taylor Hopkins, Joaquin Velez, Duane Flood, Rodney King, Justin Hopkins, Noah Sakin, Scott Neudecker, Eric Jordan, Robert Parks, Joshua Payne, John Way, Keith Kirkman, Chad Boggs, Christopher Denny, Brandon Land, the City of Graham, Alamance County, City of Graham Police Officers John Does #1-15, and Alamance County Sheriff's Deputies John Does #16-30.

## PRELIMINARY STATEMENT

1.      In the months following the murder of George Floyd by a police officer on May 25, 2020, the United States witnessed a historic movement of reckoning with the role of systemic racism in American society. At the height of the COVID-19 pandemic,

3

people around the country marched with their communities, exercising their rights to speech and assembly, to honor Mr. Floyd, to protest police brutality, and to advocate for racial justice in their communities and around the world.

2.      As the wave of racial justice protests moved across the United States, the City of Graham in Alamance County, North Carolina, a county with a deep history of racial subordination, attempted to suppress its residents' engagement in such protests by passing an ordinance that severely restricted people's ability to exercise their rights to assembly and free speech in Graham, North Carolina.

3.      The ordinance was ultimately deemed unconstitutional. People in Graham united with the nationwide movement for racial justice, forging a powerful connection between the broader national call to address systemic racism and their own community's history and personal experiences. They honored Wyatt Outlaw, the first Black Town Commissioner of Graham, who was lynched by a vigilante mob of Ku Klux Klan members in the Courthouse Square on February 26, 1970. Many linked the tragic lynching of Wyatt Outlaw to their own challenging encounters with law enforcement in Alamance County.

4.      Seeking to turn the momentum of the Summer of 2020 racial justice protests into concrete political change, community leaders in Alamance County organized the I Am Change March to the Polls event (hereinafter "March") in Graham, North Carolina to help residents exercise their right to vote. Over two hundred and fifty people, including participants of all ages and members of George Floyd's family

(collectively "March attendees"), joined together to participate in the March to rally for racial justice and to get their neighbors registered to vote.

5.     Plaintiff Kani Adon Bermudez-Bey (hereinafter "Mr. Bermudez-Bey"), a community organizer in North Carolina who worked to bring together various racial justice movement groups in Alamance County, attended the March to continue his commitment to furthering racial justice in the community.

6.     Plaintiff Regis Kishon Green (hereinafter "Mr. Green"), a longtime activist in North Carolina, stood next to Mr. Bermudez-Bey, his close friend, during the March. Mr. Green attended the March to further his commitment to racial justice activism, which began following the murder of Trayvon Martin on February 26, 2012.

7.     The March attendees, including Mr. Bermudez-Bey and Mr. Green, marched peacefully from the Wayman Chapel A.M.E. Church (hereinafter "Church") to the Court Square. As they paused for speeches under the Confederate monument in the Court Square, the March attendees were surrounded by police officers from the City of Graham Police Department (hereinafter "GPD officers") and deputies from the Alamance County Sheriff's Office (hereinafter "ACSO deputies"). They also encountered snipers at the top of the Courthouse pointing guns at them.

8.     After the conclusion of the speeches, Mr. Bermudez-Bey, Mr. Green, and March attendees, held a moment of silence in remembrance of George Floyd. They peacefully kneeled together in the Court Square for 8 minutes and 46 seconds to honor Mr. Floyd.

9.      Less than ninety seconds after the March attendees rose from their peaceful moment of silence, GPD officers and ACSO deputies armed with riot gear indiscriminately deployed pepper spray against March attendees to disperse the crowd.

10.     They did so despite the fact that March attendees, which included vulnerable children and elderly, were gathered peacefully, were not armed with any weapons, and did not pose a threat to GPD officers, ACSO deputies, or to others around them.

11.     March attendees, including Mr. Bermudez-Bey and Mr. Green, must now grapple with the emotional trauma and physical harm arising from the March. Both Mr. Bermudez-Bey and Mr. Green were distraught and sought therapy following the March. Their experience is typical of the March attendees who continue to feel the emotional and physical consequences of the violence exercised by GPD officers and ACSO deputies.

12.     Following the March,  Mr. Bermudez-Bey, Mr. Green, and other putative class member March attendees are afraid to exercise their First Amendment rights to speech and assembly in Graham, North Carolina. They fear the potential for further harm and violence at the hands of GPD officers and ACSO deputies.

13.     Shortly after the March, some people who attended the March filed lawsuits against GPD officers and ACSO deputies challenging the constitutionality of their actions at the March. Their lawsuits were consolidated and ultimately settled.

14.     The settlement of the prior lawsuits enabled a fraction of March attendees to achieve some remedy for the deep trauma they experienced. However, Mr. Bermudez-

Bey, Mr. Green and other putative class member March attendees, continue to face physical and emotional pain from the March that has neither been addressed nor remedied.

15.     Plaintiffs Mr. Bermudez-Bey and Mr. Green now bring this class action lawsuit to vindicate their rights, and the rights of the remaining March attendees, who were brutalized, terrorized, and denied their Constitutional rights by Defendants' actions at the March.

## **JURISDICTION**

16.     Plaintiffs bring this action under 42 U.S.C. § 1983 and 42 U.S.C. § 1985(3) to redress the deprivation, under the color of state law, of rights secured by the United States Constitution.

17.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. §1343(a)(1).

18.     The Court has supplemental jurisdiction over the state law tort claims in this action pursuant to 28 U.S.C. § 1367(a).

19.     This Court has personal jurisdiction over Defendants as residents of North Carolina.

## **VENUE**

20.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

Case 1:23-cv-00894-CCE-JLW   Document 1   Filed 10/24/23   Page 7 of 64

21.     Venue is also proper pursuant to N.C. Gen. Stat. § 1-77 because the claims bought by the Plaintiffs are against Defendants who acted as public officers and persons acting by virtue of their office.

## PARTIES

22.     Plaintiff Mr. Bermudez-Bey is a community organizer who resides in Smithfield, North Carolina. Mr. Bermudez-Bey is a Black man.

23.     Plaintiff Mr. Green is a longtime activist who resides in Durham, North Carolina. Mr. Green is a Black man.

24.     Defendant Terry S. Johnson ("Defendant Johnson"), sued individually and in his official capacity as Sheriff of Alamance County, is domiciled in the state, and is subject to the personal jurisdiction of this Court. In his capacity as Sheriff of Alamance County, Defendant Johnson is responsible for implementing the policy, practice, supervision, and conduct of all Alamance County Sheriff's Office ("ACSO") matters, including the appointment, training, supervision, and conduct of all ACSO personnel. In addition, Defendant Johnson is responsible for enforcing the rules of the ACSO and ensuring that ACSO personnel obey the laws of the United States and the State of North Carolina. At all relevant times, Defendant Johnson was acting within the scope of his employment and under color of state law.

25.     Defendant Alamance County is organized and exists under the laws of the State of North Carolina. Defendant Alamance County, acting through ACSO and Defendant Johnson, is responsible for the policies, practices, supervision, and conduct of

all ACSO matters, including the appointment, training, supervision, and conduct of all ACSO personnel. In addition, Alamance County is responsible for ensuring that ACSO personnel obey the laws of the United States and the State of North Carolina.

26. Defendant Cliff Parker ("Defendant Parker") is sued in his official capacity as Chief Deputy of the Alamance County Sheriff's Office and in his individual capacity, is domiciled in the state, and is subject to the personal jurisdiction of this Court. As second in command to Defendant Johnson, Chief Deputy Parker is responsible for implementing Defendant Johnson's policies and practices and supervising ACSO deputy conduct. As such, he has the authority to assign duties to sheriff's deputies. At all relevant times Defendant Parker was acting within the scope of his employment and under color of state law.

27. Defendant Barbara Tomey ("Defendant Tomey") is sued in her official capacity as a Corporal of the Alamance County Sheriff's Office and in her individual capacity, is domiciled in the state, and is subject to the personal jurisdiction of this Court. At all relevant times, Defendant Tomey was acting within the scope of her employment and under color of state law.

28. Defendant Chad Martin ("Defendant Martin") is sued in his official capacity as a Lieutenant of the Alamance County Sheriff's Office and in his individual capacity, is domiciled in the state, and is subject to the personal jurisdiction of this Court. At all relevant times, Defendant Martin was acting within the scope of his employment and under color of state law.

29.     Defendant Daniel Nichols ("Defendant Nichols") is sued in his official capacity as a Deputy of the Alamance County Sheriff's Office and in his individual capacity, is domiciled in the state, and is subject to the personal jurisdiction of this Court. At all relevant times, Defendant Nichols was acting within the scope of his employment and under color of state law.

30.     Defendant James R. McClelland ("Defendant McClelland") is sued in his official capacity as a Deputy of the Alamance County Sheriff's Office and in his individual capacity, is domiciled in the state, and is subject to the personal jurisdiction of this Court. At all relevant times, Defendant McClelland was acting within the scope of his employment and under color of state law.

31.     Defendant Randy Denham ("Defendant Denham") is sued in his official capacity as a Captain in the Alamance County Sheriff's Office and in his individual capacity, is domiciled in the state, and is subject to the personal jurisdiction of this Court. At all relevant times, Defendant Denham was acting within the scope of his employment and under color of state law.

32.     Defendant David Sykes ("Defendant Sykes") is sued in his official capacity as a Captain in the Alamance County Sheriff's Office and in his individual capacity, is domiciled in the state, and is subject to the personal jurisdiction of this Court. At all relevant times, Defendant Sykes was acting within the scope of his employment and under color of state law.

33.     Defendant Chip Cobb ("Defendant Cobb") is sued in his official capacity as a Sergeant in the Alamance County Sheriff's Office and in his individual capacity, is domiciled in the state, and is subject to the personal jurisdiction of this Court. Upon information and belief, Defendant Cobb served as the Intelligence Officer for the ACSO on October 31, 2020, and was one of the individuals responsible for strategy and tactics employed by the ACSO deputies on that day. At all relevant times, Defendant Cobb was acting within the scope of his employment and under color of state law.

34.     Defendant Peter Triolo ("Defendant Triolo") is sued in his official capacity as a Deputy of the Alamance County Sheriff's Office and in his individual capacity, is domiciled in the state, and is subject to the personal jurisdiction of this Court. At all relevant times, Defendant Triolo was acting within the scope of his employment and under color of state law.

35.     Defendant Chandler Weger ("Defendant Weger") is sued in his official capacity as a Deputy of the Alamance County Sheriff's Office and in his individual capacity, is domiciled in the state, and is subject to the personal jurisdiction of this Court. At all relevant times, Defendant Weger was acting within the scope of his employment and under color of state law.

36.     Defendant James R. McVey ("Defendant McVey") is sued in his official capacity as a Sergeant of the Alamance County Sheriff's Office and in his individual capacity, is domiciled in the state, and is subject to the personal jurisdiction of this Court.

At all relevant times, Defendant McVey was acting within the scope of his employment and under color of state law.

37.     Defendant Taylor Hopkins ("Defendant T. Hopkins") is sued in his official capacity as a Deputy of the Alamance County Sheriff's Office and in his individual capacity, is domiciled in the state, and is subject to the personal jurisdiction of this Court. At all relevant times, Defendant T. Hopkins was acting within the scope of his employment and under color of state law.

38.     Defendants Johnson, Parker, Tomey, Martin, Nichols, McClelland, Denham, Sykes, Cobb, Triolo, Weger, McVey, and T. Hopkins, are employed by the ACSO and referred to collectively throughout the Complaint as "ACSO deputies."

39.     Defendant Kristy Cole ("Defendant Cole"), sued individually and in her official capacity as Graham Chief of Police, is domiciled in the state, and is subject to the personal jurisdiction of this Court. In her capacity as Chief of Police for the Graham Police Department ("GPD"), Defendant Cole is responsible for implementing the policies, practices, supervision, and conduct of all GPD matters, including the appointment, training, supervision, and conduct of all GPD personnel. In addition, Defendant Cole is responsible for enforcing the rules of the GPD and ensuring that GPD personnel obey the laws of the United States and the State of North Carolina. At all relevant times, Defendant Cole was acting within the scope of her employment and under color of state law.

12

40.     Defendant City of Graham is a municipality organized and existing under the laws of the State of North Carolina. Defendant City of Graham, acting through GPD and Defendant Cole, is responsible for the policies, practices, supervision, and conduct of all GPD matters, including the appointment, training, supervision, and conduct of all GPD personnel. In addition, the City of Graham is responsible for ensuring that GPD personnel obey the laws of the United States and the State of North Carolina.

41.     Defendant Joaquin Velez ("Defendant Velez") is sued in his official capacity as Patrol Operations Lieutenant for the Graham Police Department and in his individual capacity, is domiciled in the state, and is subject to the personal jurisdiction of this Court. Defendant Velez is responsible for the policy, practice, implementation, and supervision of the GPD Patrol Division, the first to respond to the events of October 31, 2020. At all relevant times, Defendant Velez was acting within the scope of his employment and under color of state law.

42.     Defendant Duane Flood ("Defendant Flood") is sued in his official capacity as Support Services Captain for the GPD and in his individual capacity. He is domiciled in the state and is subject to the personal jurisdiction of this Court. At all relevant times, Defendant Flood was acting within the scope of his employment and under color of state law.

43.     Defendant Rodney King ("Defendant King") is sued in his official capacity as Sergeant for GPD at the time of the events alleged in this Complaint and in his individual capacity, is domiciled in the state, and is subject to the personal jurisdiction of

13

this Court. At all relevant times, Defendant King was acting within the scope of his employment and under color of state law.

44.     Defendant Justin Hopkins ("Defendant J. Hopkins") is sued in his official capacity as a GPD officer and in his individual capacity, is domiciled in the state, and is subject to the personal jurisdiction of this Court. At all relevant times, Defendant J. Hopkins was acting within the scope of his employment and under color of state law.

45.     Defendant Noah Sakin ("Defendant Sakin") is sued in his official capacity as a GPD officer and in his individual capacity, is domiciled in the state, and is subject to the personal jurisdiction of this Court. At all relevant times, Defendant Sakin was acting within the scope of his employment and under color of state law.

46.     Defendant Scott Neudecker ("Defendant Neudecker") is sued in his official capacity as a GPD officer and in his individual capacity, is domiciled in the state, and is subject to the personal jurisdiction of this Court. At all relevant times, Defendant Neudecker was acting within the scope of his employment and under color of state law.

47.     Defendant Eric Jordan ("Defendant Jordan") is sued in his official capacity as a GPD officer and in his individual capacity, is domiciled in the state, and is subject to the personal jurisdiction of this Court. At all relevant times, Defendant Jordan was acting within the scope of his employment and under color of state law.

48.     Defendant Robert Parks ("Defendant Parks") is sued in his official capacity as a GPD officer and in his individual capacity, is domiciled in the state, and is subject to

the personal jurisdiction of this Court. At all relevant times, Defendant Parks was acting within the scope of his employment and under color of state law.

49. Defendant Joshua Payne ("Defendant Payne") is sued in his official capacity as a GPD officer and in his individual capacity, is domiciled in the state, and is subject to the personal jurisdiction of this Court. At all relevant times, Defendant Payne was acting within the scope of his employment and under color of state law.

50. Defendant John Way ("Defendant Way") is sued in his official capacity as a GPD officer and in his individual capacity, is domiciled in the state, and is subject to the personal jurisdiction of this Court. At all relevant times, Defendant Way was acting within the scope of his employment and under color of state law.

51. Defendant Keith Kirkman ("Defendant Kirkman") is sued in his official capacity as a GPD officer and in his individual capacity, is domiciled in the state, and is subject to the personal jurisdiction of this Court. At all relevant times, Defendant Kirkman was acting within the scope of his employment and under color of state law.

52. Defendant Chad Boggs ("Defendant Boggs") is sued in his official capacity as a GPD officer and in his individual capacity, is domiciled in the state, and is subject to the personal jurisdiction of this Court. At all relevant times, Defendant Boggs was acting within the scope of his employment and under color of state law.

53. Defendant Christopher Denny ("Defendant Denny") is sued in his official capacity as a GPD officer and in his individual capacity, is domiciled in the state, and is

subject to the personal jurisdiction of this Court. At all relevant times, Defendant Denny was acting within the scope of his employment and under color of state law.

54.     Defendant Brandon Land ("Defendant Land") is sued in his official capacity as a GPD officer and in his individual capacity, is domiciled in the state, and is subject to the personal jurisdiction of this Court. At all relevant times, Defendant Land was acting within the scope of his employment and under color of state law.

55.     Defendants Velez, Flood, King, J. Hopkins, Sakin, Neudecker, Jordan, Parks, Payne, Way, Kirkman, Boggs, Denny, and Land are employed by the GPD and referred to collectively through the Complaint as "GPD Officers."

56.     Defendants John Does #1–15, whose true names are unknown to Plaintiffs and could not be discovered by Plaintiffs as of the date of the filing of this action, are all officers, agents, and/or employees of the Graham Police Department. They are each sued in their official and individual capacities. They are referred to collectively throughout the Complaint as "GPD Doe Officers."

57.     Defendants John Does #16–30, whose true names are unknown to Plaintiffs and could not be discovered by Plaintiffs as of the date of the filing of this action, are all officers, agents, and/or employees of the Alamance. They are referred to collectively throughout the Complaint as "ACSO Doe Deputies."

## **FACTUAL ALLEGATIONS**

### **A. The Burgeoning Movement for Racial Justice in Alamance County**

16

58.     The summer of 2020 was marked by widespread protests and demonstrations centered on racial justice.

59.     On March 13, 2020, Breonna Taylor was shot and killed by Louisville, Kentucky police officers who forced entry into her home.

60.     On May 25, 2020, George Floyd was murdered by a Minneapolis, Minnesota police officer who kneeled on Floyd's neck for over nine minutes—though initial reports were that the kneeling lasted only eight minutes and forty-six seconds.

61.     The murders of Breonna Taylor and George Floyd inspired nationwide outrage and enlightenment regarding the plight of Black Americans who are subject to profiling and violence at the hands of state actors and law enforcement.

62.     This racial awakening also developed more widely into a movement against discrimination towards Black Americans and other minorities in all phases of life.

63.     In big cities and small towns alike, across America and throughout the world, communities organized protests opposing the use of excessive force by police and calling for an end to systemic oppression of Black Americans.

64.     Alamance County has a long history of racial discrimination and racial subordination.

17

65.     On February 26, 1870, Wyatt Outlaw, the first Black American to serve as Town Commissioner and Constable of the town of Graham, North Carolina, was lynched in the Graham Courthouse Square.[1]

66.     On May 16, 1914, a monument located in that very same Courthouse Square was dedicated in honor of the Confederacy and Confederate soldiers (hereinafter "Confederate monument").[2]  The  Confederate monument remains today and stands in front of the Alamance County Historic Courthouse.

67.     It has long been the subject of controversy, conveying a symbolic message to nonwhite residents, particularly Black residents, of political, social, and cultural intimidation and subordination.[3]

68.     On June 29, 2020, a joint statement penned by fifty community members—including mayors, pastors, school board members, and business owners—called for the relocation of the Confederate monument.[4]

69.     In addition to the message of racial subordination conveyed by the Confederate monument, policing in Alamance County is at times clouded by racial discrimination.

---

[1] Elijah Gaddis and Seth Kotch, *Wyatt Outlaw: A Red Record*, https://lynching.web.unc.edu/the-people/wyatt-outlaw/.

[2]  UNC Institute of Museum and Library Services, *Commemorative Landscapes: Alamance County Confederate Monument, Graham*, https://docsouth.unc.edu/commland/monument/10/.

[3]  Tammy Grubb, *No plan to move Alamance County Confederate marker, despite Burlington, Elon request*, The News & Observer (July 2, 2020), https://www.newsobserver.com/news/local/article243868472.html#storylink=cpy/.

[4]Anthony Wilson, *Alamance Commissioners Rip Actions of County Leaders Who Called for Confederate Monument to Be Moved*, ABC 11 (June 29, 2020), https://abc11.com/alamance-county-graham-confederate-monument-elon/6281078/.

70. For example, in 2012, the United States Department of Justice found that the Alamance County Sheriff's Office engaged in a pattern of racially discriminatory policing that was "deeply rooted in a culture that begins with Sheriff [Terry] Johnson and permeates the entire agency."[5]

71. Given the historic and modern racial discrimination in Alamance County, people welcomed the opportunity to join the nation in protesting racial subordination in Alamance County.

72. Yet government officials in Alamance County took steps to restrict people's ability to exercise their Constitutional rights to protest.

73. For example, on June 26, 2020, the Alamance County Sheriff's Office announced that the City of Graham would not be granting permits to protest at the Courthouse Square for the foreseeable future.[6]

74. On June 27, 2020, the City of Graham Mayor Jerry Peterman extended a state of emergency declaration which imposed an 8 P.M. curfew and a temporary suspension of the issuance of protest permits "based on a clear and imminent threat to public safety."[7]

---

[5] Letter from Thomas E. Perez, Assistant Att'y Gen., U.S. Dep't of Justice, to the Alamance Cnty. Legal Dep't (Sept. 18, 2020), https://www.justice.gov/iso/opa/resources/171201291812462488198.pdf./.
[6] Mackenzie Wilkes, *ACLU of North Carolina files lawsuit against Graham for denying protest permits at Confederate monument*, Elon News Network (July 3, 2020, 12:23 PM), https://www.elonnewsnetwork.com/article/2020/07/aclu-of-north-carolina-files-lawsuit-against-graham-denying-protest-permits/.
[7] City of Graham, Amended Declaration of State of Emergency, June 27, 2020, https://www.cityofgraham.com/wp-content/uploads/2020/06/June-27-2020-State-of-Emergency.pdf.

75.     On June 27, 2020, the Graham City Council instituted an ordinance which made it unlawful for any person to gather "for the purpose of protesting" or "making known any position or thought" without a permit on public property.[8]

76.     The ordinance required protesters to obtain a permit from the Chief of Police at least twenty-four hours before any planned event. It granted the Chief of Police discretion to refuse to give a permit for several reasons and, if the permit was granted to an organizer, to limit the protest to six people and disperse it for a number of reasons.[9]

77.     Amid the racial justice protests of 2020, upon information and belief, the ordinance's purpose was to suppress the right to protest and silence the voices of demonstrators who expressed dissent against racism, police brutality, and white supremacy aimed at people of color.

78.     Upon information and belief, the ordinance's purpose was to prevent protestors from demonstrating near the Courthouse due to fear that protests would lead to protestors removing or damaging the Confederate monument.[10]

79.     Various civil rights organizations filed a lawsuit arguing that the ordinance unconstitutionally restrained free speech and assembly.[11]

---

[8] City of Graham, N.C., Code of Ordinances, ch.18, art. VI, §§ 18-172, 18-174–18-181.
[9] *Id.*
[10] Aída Chávez, *A North Carolina City Bans Protests, Protecting Confederate Monument*, The Intercept (June 30, 2020, 5:07 PM), https://theintercept.com/2020/06/30/protest-ban-north-carolina-confederate-statue/.
[11] Wilkes, *supra* note 6.

Case 1:23-cv-00894-CCE-JLW     Document 1     Filed 10/24/23     Page 20 of 64

80.     On July 6, 2020, this Court entered a consent Temporary Restraining Order preventing Graham and Alamance County officials from enforcing the ordinance.[12] The Graham City Council eventually repealed the ordinance.[13]

81.     Following the repeal of the ordinance, protests throughout Alamance County occurred regularly and were well attended by protestors calling for racial justice and counter-protesters.

82.     However, ACSO and GPD Defendants consistently impeded community members from exercising their Constitutional rights to assemble and protest for racial justice, especially near the Alamance County Historic Courthouse.

83.     Upon information and belief, they did so due to a desire to protect the Confederate monument and disdain for the viewpoints expressed by protestors.

84.     ACSO and GPD Defendants engaged in a pattern of discriminatory policing throughout the course of the protests. They allowed armed Confederate sympathizers to fill the Courthouse Square with trucks and flags, while demanding that small, unarmed groups of racial justice protesters holding up signs disperse.[14]

---

[12] *Federal Judge Blocks Graham Ordinance Requiring Protesters to Obtain Permits from Police Chief,* ABC 11 (July 6, 2020), https://abc11.com/amp/protest-ban-graham-alamance-county-news-aclu/6302655/.

[13] *NAACP, et. al. v. Peterman*, 1:20-cv-00613, ECF 27-1.

[14] Naomi P. Brown and Jason DeBruyn, *'We're Not Being Treated Fairly' Say Alamance Protesters*, WUNC 91.5 (July 10, 2020, 8:21 AM), https://www.wunc.org/news/2020-07-10/were-not-being-treated-fairly-say-alamance-protesters/.

85.     Furthermore, during these protests, the GPD posted a message criticizing the "hypocrisy" of the Black Lives Matter movement on its Facebook page.[15]

86.     During a protest for racial justice on July 11, 2020, law enforcement guarded and restricted the area where the Confederate monument sits.  The City of Graham Mayor Jerry Peterman declared the possibility of harm to the Confederate monument as an "imminent threat of widespread or severe damage, injury, loss of life."[16]

## B. October 31, 2020, March

87.     On or about August 21, 2020, Alamance County introduced a Facility Use Policy which required adherence to a permit process to reserve space at the Historic Courthouse.  It also provided rules for large gatherings taking place at the Historic Courthouse.[17]

88.     Upon information and belief, the Facility Use Policy was enacted to protect the Confederate monument.

89.     On October 20, 2020, pursuant to the Facility Use Policy, Reverend Gregory Drumwright (hereinafter "Reverend Drumwright") applied for and received a permit to utilize the Historic Courthouse grounds.

---

[15] Hayley Fowler, *No protests allowed in this North Carolina city with Confederate statue, sheriff says*, The News & Observer (June 26, 2020, 7:18 PM), https://www.newsobserver.com/news/state/north-carolina/article243831572.html/.

[16] Associated Press and Maggie Brown, *Confederate statue in Alamance County guarded by law enforcement during protests*, WRAL News (July 12, 2020, 1:05 PM), https://www.wral.com/story/confederate-statue-in-alamance-county-guarded-by-law-enforcement-during-protests/19185158/.

[17] Alamance County Historic Courthouse Facility Use Policy (Apr. 29, 2021), https://www.alamance-nc.com/sheriff/wp-content/uploads/sites/25/2021/05/Historic-Courthouse-Facility-Use-Policy-4-28-21.pdf/.

90.     He intended to use the Historic Courthouse grounds to host the March on October 31, 2020.

91.     The purpose of the March was to advance racial justice and peacefully honor George Floyd and his legacy through the promotion of voting and civic participation. The hope was that the event would encourage Alamance County residents to engage in their community through voting and call for an end to racial injustice in Alamance County.

92.     In outreach for the event, Reverend Drumwright stated: "We're gonna march down these streets with Skittles in our hands in honor of Trayvon Martin's legacy. We're gonna march down these streets with hoodies on our heads, with George Floyd's name on our backs."[18]

93.     Upon information and belief, Reverend Drumwright explained that the March would be similar to the successfully and peacefully held July 11, 2020, racial justice protest.

94.     Upon information and belief, Reverend Drumwright requested authorization to erect a stage, similar to the event on July 11, 2020, and for a short term-closure of the rotary area at the north end of the Historic Courthouse.

95.     Prior to convening the March, upon information and belief, Reverend Drumwright and other assisting individuals (collectively "March organizers") were in

---

[18] Belle Boggs, *Black Lives Matter Gets Out the Vote and Brings Politics Home*, Slate (Oct. 28, 2020, 5:45 AM), https://slate.com/news-and-politics/2020/10/black-lives-matter-alamance-county-north-carolina-voting.html.

communication with Defendants, particularly Defendant Cole, Defendant Johnson, and their respective representatives regarding the March.

96.     Upon information and belief, Reverend Drumwright expressed concern about an increased police presence, because increased police at events across the nation had resulted in Black and anti-racist protestors being arrested or treated disproportionately by law enforcement.

97.     However, upon information and belief, Reverend Drumwright and March organizers had reason to believe the protests would be safe due to the awareness by Defendants that children, the elderly, and the family of George Floyd would be present at the March.

98.     Due to the consistent communications and agreements made between March organizers and Defendant Cole; Mr. Bermudez-Bey, Mr. Green, and the other March attendees believed the March was a safe event to which they could bring their children and families.

99.     As far as Mr. Bermudez-Bey, Mr. Green, and the other March attendees were concerned, the March would be peaceful and safe like the event that occurred on July 11, 2020.

100.    On Saturday, October 31, 2020, approximately two hundred and fifty participants of all ages, including elderly and children, gathered at the Church for the March.

**C.  Mr. Bermudez-Bey and Mr. Green's Experience at The March Is
Representative of the Putative Class**

101.    Mr. Bermudez-Bey and Mr. Green were among the two hundred and fifty
participants in the March.

102.    They were excited to participate in the March.

103.    They understood the significance of the March because they were familiar
with the long history of racial discrimination in Alamance County.

104.    They were also aware of communications between the March organizers
and city and county officials regarding the March.

105.    They were told by March organizers, who were aware of the
communications made with the Defendants, that law enforcement would allow the March
to be held peacefully and that there would be a police presence to provide safety for the
March.

106.    Mr. Bermudez-Bey, Mr. Green, and other March attendees noted a
particular comfort in attending the March and bringing along family and friends because
of the peaceful nature of previous demonstrations.

107.    Mr. Bermudez-Bey and Mr. Green attended prior events organized by the
same organizers in Alamance County and never experienced violence inflicted on a
crowd at the hands of law enforcement.

108.    Indeed, at the Church, Defendant Cole explained to several March
attendees, including Mr. Bermudez-Bey and Mr. Green, that the Court Square was

blocked off for them so they would not be bothered. She added that the space was there for them.

109.    The March began at the Church and was scheduled to stop at the Court Square, near the Confederate monument, where March attendees would join in a rally encouraging people to vote. The March was then supposed to continue to the Elm Street polling place.

110.    March attendees gathered at approximately 11:00 A.M. at the Church. March attendees then walked to the Court Square, escorted by Defendant GPD Officers.

111.    Mr. Bermudez-Bey, Mr. Green, and other March attendees were orderly and calm.

112.    Upon information and belief, Defendant ACSO Deputies, GPD Officers, Doe Officers, and Doe Deputies were observed cordially talking with white counter-protesters at the Court Square before March attendees arrived.

113.    After speaking with them, the counter-protesters immediately left. One white counter-protester was overheard by a witness responding to a John Doe officer, "Let me get my car out of here so it doesn't get messed up."

114.    At the start of the March, Mr. Bermudez-Bey, Mr. Green, and other March attendees noticed that, surprisingly, counter-protesters were not as prevalent as they had been at previous protests for racial justice.

115.    Mr. Bermudez-Bey and Mr. Green stood next to each other while marching toward the Court Square.

26

116.    As they approached the Court Square, they noticed that Defendant ACSO Deputies, GPD Officers, Doe Officers, and Doe Deputies were positioned on the steps, the rooftop, and in the windows of the courthouse.

117.    Defendant ACSO Deputies, GPD Officers, Doe Officers, and Doe Deputies on the rooftop, and in the windows of the courthouse were pointing guns towards Mr. Bermudez-Bey, Mr. Green, and the other unarmed March attendees.

118.    The Court Square was blocked off for the March attendees by metal barriers as Defendant Cole explained that it would be.

119.    Mr. Bermudez-Bey and Mr. Green were both situated along the perimeter of the crowd and were among the attendees closest to Defendant ACSO Deputies, GPD Officers, Doe Officers, and Doe Deputies.

120.    Mr. Bermudez-Bey and Mr. Green, along with the other March attendees, took a knee in remembrance of George Floyd for 8 minutes and 46 seconds, representing the amount of time Minneapolis police officer Derek Chauvin pressed his knee on Mr. Floyd's neck and suffocated him to death.

121.    As Mr. Bermudez-Bey began to kneel, he saw Defendant ACSO Deputies, GPD Officers, Doe Officers, and Doe Deputies pulling out tear gas, rubber bullet guns, and riot gear.

122.    Immediately after the moment of silence, Mr. Bermudez-Bey and Mr. Green, along with the other March attendees, began to rise from their kneeling position.

27

123.    As soon as Mr. Bermudez-Bey began to rise at the conclusion of the moment of remembrance, he saw Defendant ACSO Deputies, GPD Officers, Doe Officers, and Doe Deputies approach the crowd, armed with pepper spray.

124.    It appeared as if they were attempting to disperse the crowd, but it was loud, and any verbal instructions being given by Defendant ACSO Deputies, GPD Officers, Doe Officers, and Doe Deputies were difficult for the entire crowd to hear.

125.    March attendees began to move out of the street, but due to the crowds, many were not able to immediately exit the area.

126.    Less than ninety seconds after their attempts to disperse the crowd, Defendant ACSO Deputies, GPD Officers, Doe Officers, and Doe Deputies began to directly pepper spray March attendees including women, children, elderly, and disabled participants without their consent and without reason as they posed no safety threat.

127.    Mr. Bermudez-Bey and Mr. Green were directly hit by the pepper spray due to their close proximity to the Defendant ACSO Deputies, GPD Officers, Doe Officers, and Doe Deputies.

128.    Mr. Bermudez-Bey immediately felt his eyes, nostrils, and throat begin to burn. His vision blurred as his eyes watered, and he began to cough in response to the burning sensation and horrible odor of the spray that permeated the air.

129.    Mr. Green was confused and disoriented by the first spray. He quickly realized that he was unable to breathe because of the pepper spray deployed on the crowd of March attendees.

130.    Defendant ACSO Deputies, GPD Officers, Doe Officers, and Doe Deputies should have foreseen that both physical and mental injuries would likely stem from their actions.

131.    Despite being able to foresee that their actions would cause physical and mental injuries, Defendant ACSO Deputies, GPD Officers, Doe Officers, and Doe Deputies disregarded the high probability of injury when they deployed pepper spray towards Mr. Bermudez-Bey and Mr. Green.

132.    Mr. Bermudez-Bey and Mr. Green witnessed other individuals toward whom Defendant ACSO Deputies, GPD Officers, Doe Officers, and Doe Deputies directly deployed pepper spray.

133.    Mr. Bermudez-Bey and Mr. Green witnessed several March attendees who had severe reactions to the pepper spray and assisted a disabled woman in an electric scooter who experienced what appeared to be a seizure.

134.    Mr. Bermudez-Bey and Mr. Green also witnessed children and elderly people in the crowd who had been pepper sprayed and were struggling through the effects of being sprayed.

135.    Mr. Bermudez-Bey and Mr. Green felt immense anxiety in reaction to the chaos that ensued around them as they watched members of their community struggle to breathe and see. Many March attendees were screaming in pain, while others were lying in the middle of the road.

136.    Mr. Bermudez-Bey and Mr. Green began to fear for their lives and those of the other March attendees. They did not know whether Defendant ACSO Deputies, GPD Officers, Doe Officers, and Doe Deputies would become more violent as they continued to shout, with snipers aimed at the unarmed crowd full of children and elderly people.

137.    Despite the pepper spray, Reverend Drumwright announced that they were not leaving and that they were peaceful. The March continued, and the organizers of the March set up a stage and a sound system in front of the Courthouse steps. Mr. Green and Mr. Bermudez-Bey stood onstage with several other March attendees after being pepper sprayed.

138.    While onstage, Mr. Green noticed the snipers on the roof of the Courthouse pointing their rifles directly at him and March attendees near him.

139.    Upon seeing the snipers, Mr. Green feared for his safety, and indeed his life.

140.    In that moment, Mr. Green believed that he might die from being shot by the snipers. But despite his fear, Mr. Green, along with other March attendees, decided to exercise his First Amendment rights and remain standing peacefully onstage.

141.    Less than a minute later, Defendant GPD Officers and Defendant ACSO Deputies began to unleash a second round of pepper spray at the March attendees without warning or explanation.

142.    Mr. Green was standing next to another March attendee when he was sprayed in the face. The March attendee was asking Defendant ACSO Deputies and

Defendant GPD Officers why they were being forced to leave. At this point, Mr. Green was standing about four feet away from a Defendant Doe Officer who sprayed him.

143.    The Defendant Doe Officer yelled at Mr. Green and the other March attendees to "go" several times before taking out a canister of pepper spray.

144.    Mr. Green was trying to pull the March attendee away from the interaction when the pepper spray was deployed. Due to his proximity to both the March attendee and the canister, Mr. Green was directly hit by pepper spray.

145.    Mr. Green's eyes began to water, and he was unable to see clearly. He started coughing and struggled to breathe. It took several minutes for Mr. Green to gather his bearings and be able to walk.

146.    Defendant GPD Officers and Defendant ACSO Deputies ordered the March attendees to leave. They then deployed a third round of pepper spray without giving March attendees the opportunity to exit or ensuring that the March attendees heard the order to disperse.

147.    The pepper spray forced many attendees to leave the area, effectively ending the March.

148.    Following the March, Mr. Bermudez-Bey attended community healing and meditation events to decompress and process the violence they all experienced during the March.

149.    Mr. Bermudez-Bey began to see a therapist after experiencing deep depression and anxiety. His relationships with long-time mentors and activists suffered as a result, and he no longer maintained his usual outgoing personality.

150.    The events of the March left Mr. Green feeling anxious and depressed. He struggled to sleep for several months, and he had frequent visions of snipers pointing their rifles down at him. Mr. Green began seeing a therapist, and he received a prescription for antidepressants from his primary care physician.

151.    Mr. Green also had irritation in his throat and experienced difficulty breathing in the days after being pepper sprayed.

152.    Since the March and its aftermath, Mr. Green tends to avoid participating in outward shows of activism, including attending protests. He no longer performs public relations work for activist groups as he did in the past but instead focuses on community service and mentorship.

### C.  Defendants Use of Pepper Spray Violated Best Policing Practices and Was Unreasonable

#### i.  Best Policing Practices Suggest That Pepper Spray Should Not Have Been Used At The March

153.    ACSO and GPD Defendants' use of pepper spray violates guidelines set by Defendants' own agencies, as well as internationally recognized best practices for the use of pepper spray.

32

154. The Facility Use Policy contains guidelines that suggest the goal of law enforcement when dealing with large gatherings should be to deescalate and secure compliance.

155. For example, the Facility Use Policy notes that "[e]nforcement should be at a last resort," and also requires that "[v]iolators will be provided an explanation as to the violation of law being committed and requested to refrain from continuing the conduct or relocate."[19]

156. Defendants violated the Facility Use Policy by failing to deescalate and resorting to violence against peaceful March attendees who posed no threat .

157. Defendants also violated the Facility Use Policy by failing to ask March attendees to refrain from specific conduct, or providing them with an opportunity to relocate, before deploying pepper spray.

158. Further, Defendants' use of pepper spray at the March violated international best practices.

159. The United Nation's Basic Principles on the Use of Force and Firearms by Law Enforcement Officials states that law enforcement officials should "as far as possible, apply non-violent means before resorting to the use of force and firearms" and

---

[19] *Alamance County Historic Courthouse Facility Use Policy* (Aug. 2020), https://www.alamance-nc.com/sheriff/wp-content/uploads/sites/25/2021/05/Historic-Courthouse-Facility-Use-Policy-4-28-21.pdf.

only use force and firearms "if other means remain ineffective or without any promise of achieving the intended result."[20]

160. When the lawful use of force is not avoidable, law enforcement should "[e]xercise restraint in such use and act in proportion to the seriousness of the offence and the legitimate objective to be achieved" and "[m]inimize damage and injury, and respect and preserve human life."[21]

161. Similarly, Amnesty International guidelines provide that chemical irritants, such as tear gas and pepper spray, should not be used where people are confined in an area or in a way that can cause lasting harm, including at a "too close range" or "directly aimed at people's faces." [22]

162. These best practices have also been recognized by the courts. Pepper spray is viewed as an "intermediate force" that, while less severe than deadly force, nonetheless presents a significant intrusion upon an individual's liberty interests.[23]

## ii. Defendants' Actions in Deploying Pepper Spray Were Excessive and Unreasonable

163. March attendees had permission from Defendants to assemble in the Courthouse Square.

---

[20] Eighth U.N. Congress on the Prevention of Crime and the Treatment of Offenders, Basic Principles on the Use of Force and Firearms by Law Enforcement Officials, United Nations (September 1990).
[21] *Id.*
[22] Amnesty International, *Best Practices for Law Enforcement Officials Policing Demonstrations*, https://www.amnestyusa.org/good-practice-for-law-enforcement-officials-policing-demonstrations/.
[23] *See, e.g., Smith v. City of Hemet*, 394 F.3d 689, 701–02 (9th Cir. 2005); *United States v. Mohr*, 318 F.3d 613, 623 (4th Cir. 2003).

34

164. At all relevant times, Mr. Bermudez-Bey, Mr. Green, and the other March attendees were peacefully assembled and marching to the polls.

165. Mr. Bermudez-Bey, Mr. Green, and the other March attendees were quiet and peacefully kneeling during the moment of silence for George Floyd.

166. Mr. Bermudez-Bey, Mr. Green, and the other March attendees did not brandish weapons towards Defendants.

167. Mr. Bermudez-Bey, Mr. Green, and the other March attendees did not engage in any activity that would suggest they were a physical threat.

168. Indeed, Defendant Cole acknowledged as much in a private Facebook message wherein she indicated that "the people were not violent[,] just everywhere."[24]

169. Yet Defendants pepper sprayed Mr. Bermudez-Bey, Mr. Green, and the other March attendees following the moment of silence.

170. Defendants ostensibly deployed pepper spray because the March attendees did not clear the road, as many did not hear a command to clear the road and disperse.

171. Several March attendees did not hear commands or warnings from Defendants before Defendants began to pepper spray March attendees.

172. Several March attendees did not understand, nor did they have reason to understand, that Defendants wanted them to clear the area.

173. Failing to clear the road and disperse is at best a minor infraction. Yet the Defendants used violent force for a minor infraction.

---

[24] *Drumwright v. Johnson*, No. 1:20-cv-00998-CCE-LPA (M.D.N.C 2020), ECF No. 85-13.

174.    Defendants engaged in several deployments of pepper spray to disperse Mr. Bermudez-Bey, Mr. Green, and the other March attendees.

175.    Video footage from the March shows that Defendants deployed pepper spray multiple times at the Courthouse Square.[25]

176.    Defendants pepper sprayed Mr. Bermudez-Bey, Mr. Green, and the other March attendees while they were dispersing.

177.    Defendants pepper sprayed Mr. Bermudez-Bey, Mr. Green, and the other March attendees in the square of the Courthouse.

178.    Defendants pepper sprayed March attendees at Wyatt Park.

179.    Defendants pepper sprayed March attendees on sidewalks.

180.    Defendants pepper sprayed March attendees approximately fifty yards down the street from the Courthouse Square.

181.    Defendants directly aimed pepper spray at Mr. Bermudez-Bey, Mr. Green, and the other March attendees.

182.    Defendants discharged pepper spray against March attendees, including young children, elderly persons, and those with disabilities.

183.    Due to the pepper spray, Mr. Bermudez-Bey, Mr. Green, and the other March attendees could not see or move quickly, preventing their ability to disperse.

---

[25] *See* Zachary Eanes and Carli Brosseau, *March to Alamance Polls Ends with Police Using Pepper-Spray on Protesters, Children*, The News & Observer (Apr. 7, 2022, 11:32 AM), https://www.newsobserver.com/news/local/article246861942.html.

184. Defendants' conduct in deploying the pepper spray was malicious and demonstrated reckless disregard for the March attendees.

185. For example, Defendants demanded that March attendees disperse but would not allow March attendees' rides to enter the area.

186. Defendants also would not allow paramedics to enter the area. Consequently, March attendees could not receive medical assistance at the site.

187. According to body camera footage, Defendant Way said, "He f–ing hit me, so I f–ing hit him."[26]

188. Children, elderly, and disabled participants were physically and emotionally harmed by the pepper spray deployed by Defendants.

189. March attendees experienced severe symptoms due to the exposure to pepper spray such as: burning and sensitive eyes, coughing, impaired eyesight and general respiratory issues.

190. Upon information and belief, pepper spray was not deployed by Defendants to disperse counter-protestors.

191. Defendant GPD officers, ACSO deputies, Doe officers, and Doe deputies aggressively arrested ten percent of marchers under the misdemeanor of "failure to disperse," a minor and non-violent crime.

192. All these misdemeanor charges were later dismissed.

---

[26] Carolina Public Press Nonprofit News, *Graham Protest 10/31/20. Police Bodycam. Clip 1, AXON 1317 Camera*, Youtube (July 7, 2021) (video timestamp at 0:19), https://youtu.be/YAosgdERB4E.

193. Defendant Cole approved of and ratified the conduct of GPD Defendant Officers and Defendant Doe Officers who used pepper spray on Mr. Bermudez-Bey, Mr. Green, and the other March attendees.

194. Defendant Johnson approved of and ratified the conduct of Defendant Deputies and other ACSO Deputies who used pepper spray on Mr. Bermudez-Bey, Mr. Green, and the other March attendees.

195. Defendant Johnson is a final policymaker within Alamance County for all matters related to the Alamance County Sheriff's Office. His decisions regarding the Alamance County Sheriff's Office, including all deputies thereof, constitute the official policies of Defendant Alamance County.

196. Defendant Cole is a final policymaker within the City of Graham for all matters related to the Graham Police Department. Her decisions regarding the Graham Police Department, including all officers thereof, constitute the official policies of Defendant City of Graham.

197. Defendant Parker is a policymaker within Alamance County for matters related to the position of Chief Deputy of the Alamance County's Sheriff's Office. His decisions regarding the Alamance County Sheriff's Office, including all deputies thereof, constitute the official policies of Defendant Alamance County.

198. Defendant Denham is a policymaker within Alamance County for matters related to the position of Captain in the Alamance County's Sheriff's Office. His

38

decisions regarding the Alamance County Sheriff's Office, including all deputies thereof, constitute the official policies of Defendant Alamance County.

199. Defendant Sykes is a policymaker within Alamance County for matters related to the position of Captain in the Alamance County's Sheriff's Office. His decisions regarding the Alamance County Sheriff's Office, including all deputies thereof, constitute the official policies of Defendant Alamance County.

200. Defendant Cobb is a policymaker within Alamance County for matters related to the position of Sergeant in the Alamance County's Sheriff's Office. His decisions regarding the Alamance County Sheriff's Office, including all deputies thereof, constitute the official policies of Defendant Alamance County.

201. Defendant Velez is a policymaker within the City of Graham for matters related to the position of Patrol Operations Lieutenant for the Graham Police Department. His decisions regarding the Graham Police Department, including all officers thereof, constitute the official policies of Defendant City of Graham.

202. Defendant Flood is a policymaker within the City of Graham for matters related to the position of Support Services Captain for the Graham Police Department. His decisions regarding the Graham Police Department, including all officers thereof, constitute the official policies of Defendant City of Graham.

**D. Defendants' Actions After The Event Demonstrate That Deploying Pepper Spray Was Unreasonable and Excessive Force**

203. Defendants' policy changes and After Action Reports demonstrate the unreasonableness and excessiveness of their actions at the March.

204. Upon information and belief, an Alamance County Sheriff's Office policy promulgated after the March, requires any use of a chemical agent to be promptly reported to senior officials in the Sheriff's Office, including Defendant Johnson. After receiving notice that a chemical agent was used, Defendant Johnson must develop an operational plan for continued response to the situation.

205. In a GPD After Action Report, Defendants noted for future improvement that "[t]he agency needs to create a standard proclamation with a warning to disperse for officers to follow. This warning needs to include a warning that chemicals will be utilized to disperse everyone, if needed, and not just a threat of arrest."[27]

206. In a GPD After Action Report, Defendants noted that "[b]y allowing [Plaintiffs] to stop in the roadway this led to confusion for some of the event participants and may have added to the issues of the participants trying to remain in the roadway."[28]

207. In a GPD After Action Report, Defendants made as a note for improvement that "officers need to have and know where a cut-off point is at [as] [t]his keeps officers from continuing with the crowd and pushing too far from the point of dispersal."[29]

---

[27] Decl. in Supp. Mot. to Compel Graham Defs.' Discovery, Ex. 11 at p. 13, *Drumwright v. Johnson*, No. 1:20-cv-00998 (M.D.N.C 2020), ECF No. 85-11.
[28] Decl. in Supp. Mot. to Compel Graham Defs.' Discovery, Ex. 11 at p. 15, *Drumwright v. Johnson*, No. 1:20-cv-00998 (M.D.N.C 2020), ECF No. 85-11.
[29] Decl. in Supp. Mot. to Compel Graham Defs.' Discovery, Ex. 11 at p. 13, *Drumwright v. Johnson*, No. 1:20-cv-00998 (M.D.N.C 2020), ECF No. 85-11.

208.     In a GPD After Action Report, Defendants noted that "[a]ll officers need more training in the area of Crowd Control Techniques and Dispersal. It was evident during this event that some officers lacked confidence in the use of the OC Vapor and the dispersal of the crowd."[30]

209.     In a Facebook message between Defendant Cole and an unknown individual regarding the events of the March to the Polls, Defendant Cole stated that "the people were not violent[,] just everywhere."[31]

## E.  Defendants' Use of Violence at The March Created a Chilling Effect on Future Political Participation in the Community

210.     Upon information and belief, Defendant's conduct was motivated in part by the race of the March attendees, and by the subject matter, racial justice, of the March.

211.     Upon information and belief, the Defendants showed favoritism and differential treatment to white counter-protestors compared to their treatment of March attendees, many of whom were Black or there in support of racial justice.

212.     Upon information and belief, white counter-protestors were given advance notice of pepper spray dispersal and were told to vacate the Court Square beforehand.

213.     Despite being given four separate warnings, Defendant Officers and Deputies did not attempt to arrest or physically remove white counter-protestors.

---

[30] *Id.*
[31] Decl. in Supp. Mot. to Compel Graham Defs.' Discovery, Ex. 13, *Drumwright v. Johnson*, No. 1:20-cv-00998 (M.D.N.C 2020), ECF No. 85-13.

214. The horrific event of October 31st, 2020 discouraged participation in protests or demonstrations in Alamance County by Mr. Bermudez-Bey, Mr. Green, and putative March attendee class members.

215. They are fearful that future protests will lead to police violence against them.

216. Mr. Bermudez-Bey, Mr. Green, and putative March attendee class members have experienced emotional trauma from being terrorized by pepper spray, and therefore are afraid to attend future political organizing events in Alamance County.

217. The emotional trauma faced by Mr. Bermudez-Bey, Mr. Green, and putative March attendee class members makes them not only apprehensive to participate in future events, but also fearful of retaliation by police officers.

**F. Defendants Acted Pursuant to a Conspiracy to Deprive Plaintiffs of Civil Rights**

218. ACSO and GPD Defendants jointly devised and executed a plan to deploy pepper spray against March attendees with the intent of stifling protests against the racial injustice epitomized by the Confederate monument.

219. In the days leading up to the March, Defendants held a series of meetings to formulate an Operational Plan, share intelligence, and discuss logistics of the event. This plan was jointly ratified and approved by Defendants Cole and Johnson and carried out by the ACSO and GPD Defendant Officers and Deputies.

220.    On October 22, 2020, GPD Defendant Flood and representatives from the ACSO, including Defendants Parker and Sykes, held a Zoom meeting to discuss "procedures to be followed if the polls were to have to close due to safety concerns."[32]

221.    On October 27, 2020, GPD Defendant Flood and other GPD staff met with representatives from the Graham Fire Department, Graham Public Works, Alamance Emergency Management, and the Alamance County Sheriff's Office to "further discuss planning and logistics and share further intelligence information."[33]

222.    On October 28, 2020, Defendants Flood and Velez held a GPD staff meeting to discuss and produce an Operational Plan for the March.[34]

223.    On October 29, 2020, Defendants Flood and Velez met with other GPD staff to finalize the operational plan.[35] The final Operation Plan states the following:

> This is permitted for a march on N. Main St and demonstration on the property of the Historic Courthouse. Therefore, once the march concludes at Court Square participants will be directed to clear the roadway and enter into designated areas that have been closed off for this event. Anyone failing to disperse from the roadway upon being given a lawful command shall be subject to arrest.

> If deemed necessary to disperse the crowd, Incident Command will make a request for designated Team Leaders on scene to discharge a small, controlled burst of OC spray to aid in the movement of the crowd.

---

[32] Decl. in Supp. Mot. to Compel Graham Defs.' Discovery, Ex. 5 at p. 6, *Drumwright v. Johnson*, No. 1:20-cv-00998 (M.D.N.C 2020), ECF No. 85-5.
[33] *Id*.
[34] *Id.*
[35] *Id*.

If it becomes necessary units from staging will be deployed downtown with additional munitions and control devices to assist in the movement and/or disbursement of the crowd.[36]

224. The Operational Plan, along with its authorization to use pepper spray on peaceful demonstrators, was approved by Defendant Cole.[37]

225. The Operation Plan also indicates the need for ballistic vests and pepper spray ahead of the March.[38]

226. Upon information and belief, GPD and ACSO purchased pepper spray ahead of the March, despite a long summer of protests and demonstrations without it.

227. Upon information and belief, ACSO and GPD Defendants anticipated the use of pepper spray against peaceful March attendees prior to the event taking place. Defendants Cole and Johnson ratified and approved the purchase of pepper spray in anticipation of the protest.

228. "Intel" shared with the Graham Fire Department ahead of the March shows that Defendants went into the event with the baseless predetermination that March attendees would attempt "to lure police into personal rights violations."[39]

---

[36] Decl. in Supp. Mot. to Compel Graham Defs.' Discovery, Ex. 20 at p. 5, *Drumwright v. Johnson*, No. 1:20-cv-00998 (M.D.N.C 2020), ECF No. 85-20.
[37] Decl. in Supp. Mot. to Compel Graham Defs.' Discovery, Ex. 20 at p. 8, *Drumwright v. Johnson*, No. 1:20-cv-00998 (M.D.N.C 2020), ECF No. 85-20.
[38] Decl. in Supp. Mot. to Compel Graham Defs.' Discovery, Ex. 20 at p. 2, *Drumwright v. Johnson*, No. 1:20-cv-00998 (M.D.N.C 2020), ECF No. 85-20.
[39] Decl. in Supp. Mot. to Compel Graham Defs.' Discovery, Ex. 16 at p. 4, *Drumwright v. Johnson*, No. 1:20-cv-00998 (M.D.N.C 2020), ECF No. 85-16.

229.     GPD and ACSO leadership—Defendants Johnson, Cole, Flood, Sykes, Cobb, and Denham—were stationed at a "Unified Command" post, a remote location from which they observed the March and issued orders to Defendants on the ground.[40]

230.     As March attendees reached the Courthouse Square and began assembling for a kneel of silence lasting eight minutes and forty-six seconds, Defendants on the ground received orders from Command to clear the crowd immediately after.[41]

231.     Upon hearing the order, Defendant King stated, "So eight minutes from now, we're gonna start clearing these motherfuckers,"[42] demonstrating an intent to execute a preconceived plan to utilize excessive force against March attendees that day.

232.     As March attendees concluded their moment of silence and began chanting George Floyd's name, Defendant Sakin approached Defendant King and asked, "Are we trying to differentiate between counter-protesters?" referring to white counter-protesters who gathered nearby. Defendant King said yes, they were trying to distinguish.

233.     Defendant Sakin also asked, "Once they flow down in here, are we trying to corral them inside the cones?"[43]

234.     Defendant King replied in the affirmative.[44]

---

[40] Decl. in Supp. Mot. to Compel Graham Defs.' Discovery, Ex. 5 at p. 8, *Drumwright v. Johnson*, No. 1:20-cv-00998 (M.D.N.C 2020), ECF No. 85-5.
[41] Carli Brosseau, *Alamance Judge Lets Police Lock Up Videos. Exclusive Clips Show Hostility to Protesters*, News Observer (Feb. 24, 2022, 5:27 PM), https://www.newsobserver.com/news/local/article252622428.html (order given over radio at 0:15 timestamp).
[42] *Id.* at 0:28.
[43] *Id.* at 0:31.
[44] *Id.* at 0:33.

235.    Defendant King radioed to Command shortly after, advising that his team of GPD Officers, including Defendants Sakin and J. Hopkins, were issuing orders to disperse.

236.    Body camera footage shows that Defendant King deployed a burst of pepper spray less than ninety seconds after ordering a group of hundreds to clear the roadways.[45]

237.    According to a Use of Force Report prepared by Defendant Velez, Defendant Flood authorized the use of pepper spray to disperse the March attendees at this time, indicating that the order was issued within ninety seconds of the conclusion of the moment of silence.[46]

238.    During this initial use of pepper spray, Defendant Neudecker turned to Defendant King and said, "Hit 'em again! Hit 'em again!"[47] Defendants King and Neudecker deployed pepper spray at least two more times within minutes.[48]

239.    According to Defendant Flood, who authorized its use, pepper spray was "deployed to aid in the movement of the crowd"—a group of people peacefully exercising their First Amendment rights to free speech and assembly.[49]

---

[45] *Id.* at 1:01.
[46] Decl. in Supp. Mot. to Compel Graham Defs.' Discovery, Ex. 9 at p. 1, *Drumwright v. Johnson*, No. 1:20-cv-00998 (M.D.N.C 2020), ECF No. 85-9.
[47] Carli Brosseau, *Alamance Judge Lets Police Lock Up Videos. Exclusive Clips Show Hostility to Protesters*, News Observer (Feb. 24, 2022, 5:27 PM), https://www.newsobserver.com/news/local/article252622428.html (timestamp 1:08).
[48] *Id.* at 1:15 and 1:25.
[49] Decl. in Supp. Mot. to Compel Graham Defs.' Discovery, Ex. 11 at p. 8, *Drumwright v. Johnson*, No. 1:20-cv-00998 (M.D.N.C 2020), ECF No. 85-11.

240.    ACSO and GPD Defendants worked together in giving orders to disperse and coordinated prior to the deployment of pepper spray. Video evidence shows concerted planning and joint efforts between the ACSO and GPD Defendants across the March.

241.    During the rally portion of the March, GPD Defendant Velez "notified Command to advise county units (Alamance County Sheriff's Office Deputies)" that Defendant Kirkman had seen a gas can being carried towards the stage. Defendants Velez and Kirkman were acting as co-Operations Chiefs on the ground.[50]

242.    In response, ACSO Defendants Tomey, Martin, Nichols, Weger, and McClelland emerged from the Courthouse soon after and violently removed equipment by the stage, effectively ending the March.

243.    Defendant Tomey sprayed a March attendee directly in the face after she fell in an attempt to disrupt the rally.

244.    Defendants Martin and T. Hopkins proceeded to deploy pepper spray over the heads of March attendees.

245.    Defendant McClelland deployed three bursts of pepper spray below and above the group.

246.    Defendant McVey sprayed from the grass next to the stage.

---

[50] Decl. in Supp. Mot. to Compel Graham Defs.' Discovery, Ex. 9 at p. 1, *Drumwright v. Johnson*, No. 1:20-cv-00998 (M.D.N.C 2020), ECF No. 85-9.

247.    As March attendees attempted to run from the spray and away from the Courthouse, many ran into metal barriers set up by GPD Defendants. Body camera footage shows a Defendant Doe Officer watching March attendees being sprayed and cheering, "There we go baby! There we go!"[51]

248.    At this time, no orders to disperse had been made, yet GPD Defendants stationed around the Court Square began preparing for their attack by retrieving pepper spray canisters and gas masks from their cars.

249.    Later, GPD and ACSO Defendants on the ground heard Command declare the assembly unlawful via radio. Defendant Triolo, who was stationed at the Courthouse, began issuing orders to disperse from the Courthouse steps.

250.    Defendant Velez and GPD Defendant Officers stationed around the Square began issuing orders to disperse and corralling March attendees towards Wyatt Outlaw Park where Defendants Denny, Payne, Way, and Defendant Doe Officers sprayed the March attendees again.

251.    At the conclusion of the March, once March attendees had been violently cleared from downtown Graham, Defendant Land approached Defendant King in celebration of the successful execution of their plan and said, "I knew you'd spray first. I love it! I love it!" Defendant King laughed as he gave Defendant Land a fist bump.[52]

---

[51] Jordan Wilkie, *Body cam footage from Graham march made public despite court delays*, Carolina Public Press (July 7, 2021), https://youtu.be/XdesF3ZnMec?feature=shared at 0:54.
[52] Carli Brosseau, *Alamance Judge Lets Police Lock Up Videos. Exclusive Clips Show Hostility to Protesters*, News Observer (Feb. 24, 2022, 5:27 PM), https://www.newsobserver.com/news/local/article252622428.html (timestamp 2:37).

252. Defendants' actions as alleged above demonstrate a conspiracy to deprive Mr. Bermudez-Bey, Mr. Green, and putative March attendee class members of their First Amendment Constitutional Rights.

## G. CLASS ACTION ALLEGATIONS

253. Pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) named Plaintiffs Mr. Bermudez-Bey and Mr. Green, bring this class action on their own behalf and on behalf of all other persons similarly situated. Plaintiffs seek to certify a class defined as: "all persons who attended the October 31, 2020, I Am Change March to the Polls in Graham, North Carolina, excluding those who attended as counter-protestors."

254. As set forth below, this action satisfies the numerosity, commonality, typicality, and adequacy requirements of Fed. R. Civ. P. Rule 23(a). This action also meets the requirements of Fed. R. Civ. P. 23(b)(3).

255. *Numerosity*: Approximately two hundred and fifty people attended the March, excluding counter-protestors, making joinder impracticable. While some individuals filed previous lawsuits that were settled, an estimated 200 March attendees remain whose rights have not yet been vindicated. A class action is the only practicable means by which the putative Plaintiff Class can challenge the Defendants' violation of Constitutional rights.

256. *Commonality*: There are questions of fact and law common to the putative class, and those questions predominate over all other questions affecting individual class members. All putative Plaintiff class members have the same federal rights as

49

incorporated to the States by the Fourteenth Amendment to the United States Constitution: (a) the right to freedom of assembly and speech as guaranteed by the First Amendment, and (b) the right to be free from unreasonable search and seizure, and thereby from excessive force, as guaranteed by the Fourth Amendment.

The common questions of fact shared by the class include:

a. Whether pepper spray was deployed, and if so, where, and how many times;

b. Whether a sound basis for deploying pepper spray existed;

c. Whether pepper spray was deployed against individuals already dispersing;

d. Whether pepper spray caused a chilling effect on the speech of March attendees;

e. Whether Defendants endorsed and sanctioned the use of pepper spray against March attendees;

f. Whether the speech of March attendees was chilled due to the excessive pepper spraying of police officers;

g. Whether March attendees were peacefully assembled;

h. Whether Defendants adequately notified the March attendees of order to disperse;

i. Whether Defendants provided sufficient time for March attendees to disperse after giving order;

The common questions of law shared by the class include:

a. Whether Defendants' use of pepper spray to disperse March attendees would chill a person of ordinary firmness from continuing to engage in expressive assembly;

50

b. Whether there was a nexus between Defendants' use of pepper spray and an intent to chill the speech of the March attendees;

c. Whether Defendants were acting under color of law when deploying pepper spray;

d. Whether Defendants' use of pepper spray was objectively unreasonable and thus constituted excessive force;

e. Whether Defendants' plan to disperse March attendees through the deployment of pepper spray constituted a conspiracy to prevent March attendees from exercising their rights to speech and assembly;

f. Whether monetary, injunctive, and declaratory relief is appropriate and if so, what the terms of such relief should be;

The relief sought for the proposed Class is common to all members of the Class. Plaintiffs seek monetary, injunctive, and declaratory relief.

257. **Typicality:** The claims of the named Plaintiffs are typical of the claims of the class. The named Plaintiffs' claims arise from Defendants' use of pepper spray to chill the speech of March attendees. Mr. Bermudez-Bey and Mr. Green have suffered the same violation of Constitutional rights alleged for the Class.

258. The named Plaintiffs, Mr. Green and Mr. Bermudez-Bey attended the March to the Polls event on October 31, 2020, and are thus members of the class as defined. The named Plaintiffs and the putative Class members suffered the same injury and violation of Constitutional rights.

51

259. Because Plaintiffs Mr. Green and Mr. Bermudez-Bey and the proposed Class challenge the same unconstitutional behavior, the Defendants will likely assert similar defenses against Mr. Green and Mr. Bermudez-Bey and proposed Class members.

260. Moreover, the answer to whether the Defendants' behavior is unconstitutional, will determine the success of the claims of named Plaintiffs Mr. Green and Mr. Bermudez-Bey, and putative Class members.

261. ***Adequate Representation:*** The named Plaintiffs will fairly and adequately protect the interests of the Class they seek to represent. Their interests are aligned with the interests of the Class. There is no known conflict among class members.

262. ***Class Certification:*** A class action is superior to other methods for the fair and efficient adjudication of this controversy and this litigation presents no unusual manageability problems. A class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication and comprehensive supervision by a single court.

263. Class certification is appropriate under Rule 23(b)(3) because the common questions of fact and law predominate over questions specific to individual class members. The common questions of law will determine the liability of the Defendants to every member of the class. Class-wide treatment of liability is a superior means of determining the legality of the Defendant's actions as opposed to many individual lawsuits.

## CLASS ACTION CAUSES OF ACTION

### First Cause of Action

### 42 U.S.C. § 1983 – First Amendment Retaliation

### (All Plaintiffs against All Defendants)

264.　Mr. Bermudez-Bey, Mr. Green, and putative March attendee class members hereby incorporate all other paragraphs of this Complaint as if fully set forth in this claim.

265.　Mr. Bermudez-Bey and Mr. Green bring this claim on behalf of themselves and the putative class of March attendees whom they seek to represent.

266.　Mr. Bermudez-Bey, Mr. Green, and putative March attendee class members engaged in constitutionally protected speech and assembly by participating in the March.

267.　Defendant GPD Officers, ACSO Deputies, Doe Officers, and Doe Deputies indiscriminately deployed pepper spray, causing injuries to Mr. Bermudez-Bey, Mr. Green, and putative March attendee class members.

268.　In addition, Defendants Velez, Flood, King, City of Graham, County of Alamance, Parker, Denham, Sykes, and Cobb planned and approved the use of pepper spray.

269.　At all relevant times, Defendants acted under color of state law.

270.　Defendant Johnson endorsed and officially sanctioned the actions taken by Defendant ACSO Deputies and Doe Deputies when they deployed pepper spray against Mr. Bermudez-Bey, Mr. Green, and putative March attendee class members.

271.    Defendant Cole endorsed and officially sanctioned the actions taken by Defendant GPD Officers and Doe Officers, when they deployed pepper spray against Mr. Bermudez-Bey, Mr. Green, and putative March attendee class members.

272.    Defendants' conduct would likely deter and chill a person of ordinary firmness from participating in future marches for fear of being subject to comparable force. In fact, Defendants' conduct has deterred Mr. Bermudez-Bey, Mr. Green, and putative March attendee class members from attending further marches and protests.

273.    Defendants refrained from employing pepper spray on counter-protesters, even when these counter-protesters gathered in the same area as Mr. Bermudez-Bey, Mr. Green, and putative March attendee class members.

274.    Defendants deployed pepper spray minutes after Mr. Bermudez-Bey, Mr. Green, and putative March attendee class members gathered to kneel in honor of George Floyd's memory.

275.    Defendants' conduct was at least partially motivated by the presence of peaceful March attendees commemorating the life of George Floyd, a Black man who was killed by police officers, and seeking racial justice.

276.    As a direct and proximate result of Defendants' conduct, Mr. Bermudez-Bey, Mr. Green, and putative March attendee class members sustained the injuries detailed above. These injuries deterred them from exercising their First Amendment rights.

**Second Cause of Action**

54

**42 U.S.C. § 1983 – Fourth Amendment Excessive Force**

**(All Plaintiffs against All Defendants)**

277.     Mr. Bermudez-Bey, Mr. Green, and putative March attendee class members hereby incorporate all other paragraphs of this Compliant as if fully set forth in this claim.

278.     Mr. Bermudez-Bey and Mr. Green bring this claim on behalf of themselves and the putative class of March attendees whom they seek to represent.

279.     At all relevant times, Defendants acted under color of state law.

280.     Defendants' use of pepper spray to forcibly disperse those peacefully assembled and marching to the polls constituted excessive force and violated their Fourth Amendment rights.

281.     The Defendants deliberately and intentionally deployed pepper spray in an attempt to gain physical control over Mr. Bermudez-Bey, Mr. Green, and putative March attendee class members.

282.     At all relevant times, Defendants have acted under color of state law.

283.     Mr. Bermudez-Bey, Mr. Green, and putative March attendee class members were engaged in a March that had been approved beforehand by Defendants.

284.     Mr. Bermudez-Bey, Mr. Green, and putative March attendee class members were entirely peaceful and nonviolent during the March.

285.     At no point did Mr. Bermudez-Bey, Mr. Green, or putative March attendee class members pose any risk of injury or harm to themselves, other people, or property.

286.    At no point did Mr. Bermudez-Bey, Mr. Green, or putative March attendee class members pose an immediate threat to the safety of the Defendants.

287.    Defendants provided insufficient time for Mr. Bermudez-Bey, Mr. Green, and putative March attendee class members to disperse from the Courthouse Square before deploying pepper spray against them.

288.    Mr. Bermudez-Bey, Mr. Green, and putative March attendee class members were never in violation of any law as they assembled in the Courthouse Square.

289.    March attendees that were arrested, and whose charges were ultimately dismissed, were charged with failure to disperse. The charge is a misdemeanor and a minor, nonviolent crime, and is thus of insufficient severity to warrant the use of pepper spray to disrupt the alleged illegal activity.

290.    Defendants' deployment of pepper spray was unreasonable and to such an extent as to lead to unnecessary injury.

291.    By using pepper spray on March attendees without justification or failing to intervene to prevent the unjustified use of pepper spray by other officers, Defendants subjected March attendees to excessive force.

292.    As a direct and proximate result of Defendants' conduct, Mr. Bermudez-Bey, Mr. Green, and the other March attendees have sustained the injuries detailed above.

**Third Cause of Action**

**42 U.S.C. § 1985(3) – Conspiracy to Deprive Civil Rights**

**(All Plaintiffs against All Defendants)**

56

293.    Mr. Bermudez-Bey, Mr. Green, and putative March attendee class members hereby incorporate all other paragraphs of this Complaint as if fully set forth in this claim.

294.    Mr. Bermudez-Bey and Mr. Green bring this claim on behalf of themselves and the putative class of March attendees whom they seek to represent.

295.    At all relevant times, Defendants acted under color of state law.

296.    Defendants violated 42 U.S.C. § 1985(3) by knowingly conspiring for the purpose of depriving plaintiffs of their First Amendment right to freedom of assembly and speech.

297.    Defendants' actions were motivated in part by race-based discriminatory animus against racial justice demonstrations.

298.    The March was an event in support of racial justice efforts.

299.    White counter-protesters at the March did not experience the same animus or treatment by Defendants.

300.    The Defendants acted for the purpose of depriving Mr. Bermudez-Bey, Mr. Green, and putative March attendee class members equal protection under the law.

301.    Defendants coordinated with each other to create a plan to disperse March attendees using pepper spray.

302.    GPD and ACSO Defendants communicated with each other leading up to and during the March, regarding the use of pepper spray to disperse March attendees.

303.   Mr. Bermudez-Bey, Mr. Green, and putative March attendee class members experienced significant physical and emotional harm as a result of their actions.

304.   By deploying pepper spray to disperse the March attendees, Defendants suppressed the March attendees' First Amendment rights to peacefully protest.

305.   Mr. Bermudez-Bey, Mr. Green, and putative March attendee class members could not continue to exercise their voice because of the violence used to disperse the March and were ultimately forced to abandon the peaceful march to the polls.

306.   The Defendants' conspiracy also suppressed future opportunities to peacefully demonstrate. Mr. Bermudez-Bey, Mr. Green, and putative March attendee class members fear going to protests again because of a fear of how police will respond.

307.   Defendants knew or should have known that their deployment of pepper spray to disperse the crowd was an excessive use of force against a peaceful demonstration.

308.   Defendants knew or should have known that their deployment of pepper spray would deter Mr. Bermudez-Bey, Mr. Green, and putative March attendee class members from exercising their Constitutional right to free speech and assembly in the future.

### Fourth Cause of Action

**Assault**

**(Plaintiffs Mr. Bermudez Bey and Mr. Green against all Defendants)**

309.    Mr. Bermudez-Bey and Mr. Green hereby incorporate all other paragraphs of this Complaint as if fully set forth in this claim.

310.    Mr. Bermudez-Bey and Mr. Green bring this claim on behalf of themselves.

311.    As the crowd began to kneel in remembrance of George Floyd, GPD officers, ACSO deputies and Doe Officers and Deputies pulled out tear gas, rubber bullet guns, and riot gear.

312.    GPD Officers, ACSO Deputies, Doe Officers, and Doe Deputies intentionally threatened Bermudez-Bey and Mr. Green with imminent bodily injury by approaching them armed with pepper spray.

313.    Mr. Bermudez-Bey was located directly in front of GPD officers, ACSO Deputies, Doe Officers, and Doe Deputies, and he had reasonable apprehension that harmful contact with his person was imminent, because he watched as armed Defendants walked towards the unarmed crowd with the pepper spray in his hand.

314.    Mr. Green had reasonable apprehension that harmful contact with his person was imminent because he saw snipers pointed at him and the March attendees near him.

315.    Mr. Bermudez-Bey and Mr. Green were conscious and aware of the imminent contact.

316.    Defendant GPD Officers, ACSO Deputies, Doe Officers, and Doe Deputies acted as agents of the City of Graham or Alamance County.

**Fifth Cause of Action**

59

**Battery**

**(Plaintiffs Mr. Bermudez Bey and Mr. Green against all Defendants)**

317.　Mr. Bermudez-Bey and Mr. Green hereby incorporate all other paragraphs of this Complaint as if fully set forth in this claim.

318.　Mr. Bermudez-Bey and Mr. Green bring this claim on behalf of themselves.

319.　Defendant GPD Officers, ACSO Deputies, Doe Officers, and Doe Deputies intentionally deployed pepper spray which directly hit Mr. Bermudez-Bey and Mr. Green, causing burning, irritation, and inflammation of their eyes.

320.　The bodily contact occurred without the consent of either Mr. Bermudez-Bey or Mr. Green.

321.　Defendant GPD Officers, ACSO Deputies, Doe Officers, and Doe Deputies acted as agents of the City of Graham or Alamance County.

**Sixth Cause of Action**

**Negligence**

**(Plaintiffs Mr. Bermudez-Bey and Mr. Green against all Defendants)**

322.　Mr. Bermudez-Bey and Mr. Green hereby incorporate all other paragraphs of this Complaint as if fully set forth in this claim.

323.　Defendant GPD Officers, ACSO Deputies, and Doe Officers and Deputies owed Mr. Bermudez-Bey and Mr. Green a special duty to provide protection during the March.

324. Mr. Bermudez-Bey and Mr. Green came to expect this protection due to statements made by Defendant Cole at the March.

325. Defendants failed to follow this special duty when they deployed pepper spray against Mr. Bermudez-Bey and Mr. Green.

326. Defendants owed Mr. Bermudez-Bey and Mr. Green a duty to exercise ordinary care in their use of weapons and deployable instruments.

327. Defendants also failed to use ordinary care by directly deploying pepper spray towards Mr. Bermudez-Bey's and Mr. Green's face. Under similar circumstances, in the discharge of official duties of like nature, a reasonably prudent person would not deploy pepper spray towards Mr. Bermudez-Bey and Mr. Green.

328. Defendants' negligence was a proximate cause of Mr. Bermudez-Bey's and Mr. Green's injury as the deployment of pepper spray directly towards them caused injury.

## Seventh Cause of Action

### (Plaintiffs Mr. Bermudez Bey and Mr. Green against all Defendants)

### Intentional Infliction of Severe Emotional Distress

329. Mr. Bermudez-Bey and Mr. Green hereby incorporate all other paragraphs of this Complaint as if fully set forth in this claim.

330. Defendant GPD Officers, ACSO Deputies, and Doe Officers and Deputies deployed pepper spray towards Mr. Bermudez-Bey and Mr. Green in an extreme and outrageous manner.

331. Deploying pepper spray towards Mr. Bermudez-Bey and Mr. Green exceeded all bounds of decency tolerated by society, and the physical and mental injuries that resulted and the foreseeability of such injuries illustrate the outrageousness of Defendants' conduct.

332. Defendants' deployment of pepper spray was recklessly indifferent to the likelihood it would cause severe emotional distress to Mr. Bermudez-Bey and Mr. Green. Defendants exhibited a deliberate disregard of the high probability that emotional distress would follow from their conduct.

333. Defendants' deployment of pepper spray towards Mr. Bermudez-Bey and Mr. Green in fact caused severe emotional distress to Mr. Bermudez-Bey and Mr. Green, as it led them to develop severe depression and anxiety that was observed and treated by mental health professionals.

## Eighth Cause of Action

**(Plaintiffs Mr. Bermudez Bey and Mr. Green against all Defendants)**

**Negligent Infliction of Emotional Distress**

334. Mr. Bermudez-Bey and Mr. Green hereby incorporate all other paragraphs of this Complaint as if fully set forth in this claim.

335. Defendant GPD Officers, ACSO Deputies, Doe Officers, and Doe Deputies were negligent in their deployment of pepper spray.

336. Defendants owed a special duty towards Mr. Bermudez-Bey and Mr. Green.

337.    Defendants failed to fulfill this duty when they deployed pepper spray towards Mr. Bermudez-Bey and Mr. Green.

338.    Mr. Bermudez-Bey and Mr. Green suffered severe emotional distress thereafter, as it led them to develop severe depression and anxiety that was observed and treated by mental health professionals.

339.    Defendant officers' deployment of pepper spray was a proximate cause of the plaintiff's severe emotional distress. The violation of Mr. Bermudez-Bey's and Mr. Green's trust and bodily autonomy, as well as their sincere concern for other individuals who were affected by Defendants' actions, led to Mr. Bermudez-Bey and Mr. Green developing severe emotional distress.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

a.  Declare that Defendants' deployment of pepper spray was a retaliatory act contrary to the law;

b.  Declare that Defendants' deployment of pepper spray amounted to an excessive use of force contrary to the law;

c.  Declare that Defendants' deployment of pepper spray deprived Plaintiffs of their civil rights – contrary to the law;

d.  Award damages against individuals who were injured during the March;

e.  Award attorney's fees and costs associated with this litigation;

f.  Grant injunctive relief enjoining the use of pepper spray on protestors; and

g. Grant such other relief as this Court may deem proper.

**TRIAL BY JURY DEMANDED.**

Respectfully Submitted,

Dated: October 24, 2023

/s/ Erika K. Wilson
Erika K. Wilson
NC Bar. No.45020
UNC Clinical Programs
102 Ridge Road
Chapel Hill, NC 27514
Telephone: (919) 962-2552
Fax: (919) 962-3375
wilsonek@email.unc.edu
*Counsel for Plaintiffs Adon Kani Bermudez-Bey and Regis Shon Green*